**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARITO CENDANA ANABEZA,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security,<br><br>　　　　　Defendant. | Case No. 1:12-CV-01743-SMS<br><br>ORDER AFFIRMING AGENCY'S DENIAL<br>OF BENEFITS AND ORDERING<br>JUDGMENT FOR COMMISSIONER |

Plaintiff Charito Anabeza ("Plaintiff"), by her attorney Cyrus Safa, seeks review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability insurance benefits (DIB) under Title II and supplemental security income (SSI) under Title XVI of the Social Security Act. The matter is before the Court on the parties' cross-briefs, which were submitted without oral argument. Both parties consented to the jurisdiction of a magistrate judge. Docs. 13 & 14. The Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a whole and based upon proper legal standards. Accordingly, the Court affirms the Commissioner's determination.

I. **Procedural History**

Plaintiff claims disability since August 22, 2005. She first filed for SSI and DIB benefits[1] in September 2006. An ALJ found that she had been disabled for a "closed period" from August 22,

---

[1] DIB is paid to disabled persons who have contributed to the Social Security program. 42 U.S.C. § 401 *et seq*. SSI is paid to disabled persons with low income. 42 U.S.C. § 1382 *et seq*. Where the applicable DIB and SSI regulations are virtually identical, only the DIB regulation will be identified in this opinion.

2005 through August 28, 2008, then recovered. Plaintiff did not appeal that decision, and it is *res judicata* through the June 8, 2009 decision. *Chavez v. Bowen,* 844 F.2d 691 (9th Cir.1988).

Plaintiff applied again for SSI and DIB benefits, in February and March 2010 respectively. She claimed an onset date of the day after the ALJ's prior decision. AR 37. Her applications were denied in September 2010 and upon reconsideration in January 2011. After a hearing on July 15, 2011, ALJ Jordan Scott denied her applications on August 16, 2011. Because the Appeals Council declined review, this ALJ decision is the decision reviewed in this appeal.

## II.    Facts

The record contains a letter dated March 19, 2009, from Radhey Bansal, M.D., one of Plaintiff's treating physicians. AR 431-434. Dr. Bansal tells Plaintiff's social security attorney that Plaintiff has been in his care for at least two years for chronic severe left shoulder pain and limited left shoulder function since undergoing a mastectomy four years earlier. She had occasional edema throughout the arm. She also had "a lot of depression" and anxiety since her cancer diagnosis. On physical evaluation, Plaintiff had no focal neurological deficits or pitting edema. Aside from her "chronically frozen shoulder on the left side," her joints and range of motion were unremarkable. However, she had tenderness and restricted range of motion around her left shoulder and reduced left grip strength. She also had "crying spells" during the clinical interview. In conclusion, Dr. Bansal described Plaintiff as "markedly restricted in her activity" and "markedly depressed," with "almost nil" chance for improvement. She could not perform her past work as a certified nurse's assistant or any other work requiring the use of her arms and any pushing, pulling, or lifting.

It is *res judicata* that Plaintiff was not disabled through June 2009, her alleged onset date of disability. Since that time, she visited the Comprehensive Medical Group with complaints of left shoulder pain. AR 409-12, 427-30, 483-86, 496-500. She also received follow-up care for her history of breast cancer and refills of her psychotropic medication. AR 409-12, 427-30, 483-86, 496-500. She had tenderness, restricted range of motion, and occasional edema in her left shoulder at examinations performed during these visits. AR 409-12, 427-30, 484-85, 496, 499-500. She did not undergo treatment or examination of her psychiatric complaints during these visits.

On May 3, 2010, Plaintiff completed a questionnaire regarding her daily functioning. AR 223-229. In a typical day, she prepared meals, cleaned, watered her plants, and went to church. She could take care of her family and her pets. She could also attend to her personal care, shop, drive a car, manage her finances, and participate in hobbies (such as reading "good books" and singing). Her mental impairments affected her ability to sleep. She was limited in her ability to lift, reach, kneel, climb stairs, maintain concentration, and follow instructions. She also alleged impairments in her vision, memory, and capacity to tolerate stress and changes in routine. She denied any problems getting along with others, but stated that she was "not interested" in such interaction.

Greg Hirokawa, Ph.D., performed a consultative psychological evaluation on July 29, 2010. AR 436-40. Plaintiff alleged symptoms such as impaired memory, depression, impaired concentration, confusion, and anxiety. She had a "friendly and cooperative" manner, appropriate appearance, normal behavior, and normal speech. She interacted "appropriately" with Dr. Hirokawa and his staff. Her thought processes, thought content, intelligence, concentration, fund of knowledge, memory, and ability to perform calculations were all intact. She denied harmful ideation or psychosis. She had a depressed mood and restricted affect. She could cook, do laundry, sweep, garden, and participate actively in church. She maintained "good" and "close" relationships with her "many" friends. Dr. Hirokawa opined that Plaintiff had no more than "moderate" impairment in her capacity to perform work-related activities. In particular, she had "mild to moderate" limitations in her ability to follow simple instructions, maintain adequate attention and concentration, function independently, and sustain an ordinary routine without special supervision.

Juliane Tran, M.D., performed a consultative physical evaluation on August 28, 2010. AR 457-61. Plaintiff alleged pain in her left shoulder and left axilla areas. She complained of restricted range of motion and neuropathy in her left arm, preventing her from performing overhead activities or carrying heavy items. She also complained of pain in her knees. She could cook and clean dishes during a typical day, but could not vacuum, mop, or perform gardening.

Dr. Tran observed that Plaintiff walk around the examination room normally and without assistance. Plaintiff sat, got on and off the examination table, and wore and removed her shoes without difficulty. Plaintiff's heel and toe and tandem walking were normal, and tests of her

balance were negative. She had tenderness and reduced range of motion in her left shoulder, but inspections of her remaining joints were unremarkable. Similarly, Plaintiff had reduced strength in her left deltoid, but her motor strength was otherwise normal. Dr. Tran opined that Plaintiff had restrictions in performing overhead activities, climbing, balancing, or working at height because of her left shoulder impairment. She concluded Plaintiff could lift twenty pounds occasionally and ten pounds frequently during a normal workday. Her capacity to grasp, finger, stand, bend, stoop, kneel, crouch, and sit was unlimited.

Richard Betcher, M.D., and Paul Klein, Psy.D., assessed Plaintiff's residual functional capacity for the State agency. AR 454-456, 463-67. In his September 1, 2010 assessment, Dr. Klein stated that Plaintiff could perform simple, unskilled work. AR 94, 454-56. On September 14, 2010, Dr. Betcher concluded that Plaintiff could lift twenty pounds occasionally and ten pounds frequently. AR 464. She could stand (and walk) for about six hours total and sit for about six hours total during a typical workday. Aside from climbing ladders, ropes, and scaffolds, Plaintiff could perform a full range of postural activities at least occasionally in a workday. Dr. Betcher also stated that Plaintiff could reach overhead with her left arm occasionally during a typical workday, but had no other manipulative restrictions. J. Mitchell, M.D., and K. Ying, M.D., a consulting physician and psychiatrist (respectively), reviewed Plaintiff's records and affirmed the earlier RFC assessments for the State agency in January 2011. AR 479-81.

In an October 9, 2010 questionnaire, Dr. Bansal reiterated that Plaintiff had substantial restrictions in her ability to sustain work-related activities. AR 491-93. She could lift less than ten pounds during a normal workday. She could stand (and walk) for at least two hours and sit for six hours during the workday. Aside from reaching with her left arm and climbing, she could perform a full range of postural and manipulative activities at least occasionally during a normal workday. Her prognosis was "poor for any work/employment." In February 25 and April 19, 2011 notes, Dr. Bansal stated that Plaintiff was "totally" and "permanently" disabled. AR 490, 495.

In a December 4, 2010, report of her day-to-day functioning, Plaintiff again stated that she could take care of her family and pets, attend to her personal care, prepare meals, drive a car, shop, manage her finances, and perform chores such as cleaning, dusting, and sweeping. AR 257-60. She

sang and danced as hobbies and remained active within her church. She denied any difficulties getting along with friends, family, or authority figures. She alleged restrictions in her memory and her ability to lift, reach, walk, climb stairs, maintain concentration, and understand and follow instructions. Plaintiff's husband echoed her description of her capabilities and limitations in a separate December 2010 questionnaire. AR 249-56.

**Plaintiff's Testimony**

At the hearing on July 15, 2011, Plaintiff testified that she was unable to work because of memory difficulties, restrictions in her ability to lift, anxiety, and depression. AR 40-46. She testified that she remained in pain after her breast cancer surgery. Her pain stemmed from under her left arm in the lymph node area, the area of her surgery. She felt the pain on average two to four times per week, sometimes more often, lasting five to fifteen minutes. She could lift a half-gallon of milk, but not a full gallon. She had problems using her left arm to reach and grab something in front of her. AR 50. She had difficulties using her left arm to lift anything other than "light" items, such as a cup of coffee. AR 51. The pain increased the higher she lifted. *Id.*

She also suffered from anxiety and depression. Medication helped, but she still suffered bouts of depression "three to four days" a week. AR 45, 51. These could last approximately two to three hours and include crying spells. AR 52. Her medication caused forgetfulness.

**Testimony of Internal Medicine Expert**

At the hearing, Dr. John Morse testified as an internal medicine expert. Plaintiff's first identifiable impairment was carcinoma of the left breast, with onset in August 2007. She was cancer-free after mastectomy, lymphadenectomy, and extensive radiation and chemotherapy. Her second issue, potentially related, was a frozen left shoulder, as outlined in the orthopedic evaluation (*see* AR 457-462). He had few objections to the RFC offered by Dr. Tram, adding only that she must avoid concentrated exposure to industrial hazards such as machinery or heights and that aside from ladders, ropes, and scaffolds, she could do posturals no more than frequently.

**Testimony of Psychiatric Expert**

Dr. Shakil Mohammed testified as a mental health expert. He reviewed the psychological examination (*see* AR 436-440) and the psychiatric review technique and mental RFC (*see* AR 442-

456). Although the examiner identified cognitive decline, Dr. Mohammed found no objective data for that diagnosis. Instead, Plaintiff's identifiable impairments were 12.04, depressive disorder not otherwise specified, and 12.06, generalized anxiety disorder. Plaintiff did not meet or equal either of these listings. In terms of functional limitations, her concentration was moderately impaired, limiting her to simple, repetitive tasks with one to three steps, or simple to moderately complex work. She had no impediment to interacting with coworkers or supervisors, but had a moderate limitation in contact with the public. She could handle low to moderate stress, consisting of few changes in work or its setting and a few decisions sometimes.

**Testimony of Vocational Expert**

Robin Scher testified as an impartial vocational expert, describing the jobs a person could do given various limitations. For each hypothetical, Ms. Scher first opined whether the limitations permitted Plaintiff's past work, which she characterized as nurse assistant (medium, 4).[2] If so, she further opined whether the same person, with Plaintiff's occupational profile (age, education, and past work), could adjust to other work. *See* 20 C.F.R. §404.1560.

The ALJ's first hypothetical set of limitations represented the RFC that he would ultimately adopt in his decision, consisting of the combined assessments of Drs. Morse and Mohammed. The hypothetical person could lift and carry 10 pounds frequently, 20 occasionally, with frequent postural except a preclusion from ladders, ropes, and scaffolds; from unprotected heights and hazardous, moving machinery; and (for the left arm) from overhead reaching above shoulder level, permitting occasional reaching in front at shoulder level, normal reaching to the desktop, and frequent pushing and pulling. Mentally, the person could engage in simple, repetitive, one to three step tasks, limited to occasional contact with the public, low to moderate stress, meaning normal decisionmaking but few changes in the work or its setting. The person may be off task up to five percent of the workday beyond ordinary breaks due to anxiety or pain.

As to this hypothetical, Ms. Scher stated that the person could not perform Plaintiff's past work. However, the person could perform the job of companion, a semiskilled profession with

---

[2] In the parenthetical, the strength rating captures how much exertion the job requires and whether this is occasional (up to a third of a day), frequent (two thirds), or constant. The Specific Vocational Preparation number ranks, from one to nine, how long it takes to learn the job. Dictionary of Occupational Titles (4th ed.1991) Appendix C.

transferable skills (light, semiskilled—300 jobs in Bakersfield, 7,000 in California, 104,000 nationally). Plaintiff could also do jobs such as advertising material distributor (light, 2—5,000 in California, 53,000 nationally) and office helper (light, 2—6,600 in California, 50,000 nationally).

### III. Disability Standard

To be disabled, a claimant must have impairments which foreclose all meaningful employment for at least twelve months. 42 U.S.C. § 1382c(a)(3). To make the disability determination more uniform and efficient, ALJs follow a five-step "sequential evaluation process," stopping once they reach a dispositive finding. 20 C.F.R. §§ 404.1520, 1594(b)(5). The claimant has the burden for the first four steps. *Terry v. Sullivan,* 903 F.2d 1273, 1275 (9th Cir.1990).

The sequential process begins with a "*de minimis* screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir.1996). At steps one and two, the ALJ confirms that the claimant is not meaningfully employed and in fact has severe impairments. Once a claimant passes this screening, the remaining steps examine whether she is disabled.

The claimant may prove this in two ways. One way—considered at step three—is to have a condition that is disabling by definition. *See* 20 C.F.R. Pt. 4, Subpt. P, App. 1 (the "listings"). Failing this, she must present evidence of her residual functional capacity ("RFC," the most she can do despite her limitations). The ALJ determines this RFC, then at steps four and five applies this to the world of work. If the claimant's RFC forecloses her past work, and if the Commissioner cannot satisfy her burden to identify a significant number of other jobs that the claimant could learn, then the claimant is disabled.

### IV. The ALJ's Decision

The ALJ followed the five-step sequential evaluation process outlined above. At steps one and two, the ALJ found that Plaintiff's claim was not clearly meritless: she had not worked since the alleged date of disability and she had severe impairments capable of lasting twelve months. These impairments included a frozen left shoulder with associated left axilla tightness and discomfort from prior cancer surgery and lymphadectomy; depressive disorder not otherwise specified; and general anxiety disorder. Her breast cancer was fully cured.

However, Plaintiff could not prove she was disabled. At step three, her condition did not meet or equal a "listing," and at steps four and five her RFC and vocational profile did not foreclose meaningful work. Specifically, her RFC corresponded to the limitations set forth by Drs. Mohammed and Morse and described in the ALJ's first hypothetical. Although this RFC foreclosed her past work, the Commissioner identified a significant number of other jobs that she could learn given her age, education, and experience—namely, those described by the vocational expert in response to the hypothetical.

On appeal, Plaintiff argues that the ALJ improperly discredited her subjective claims regarding the extent of her mental impairments.

## V. Scope of Review

Congress has provided a limited scope of judicial review of a decision to deny benefits. This Court may review only whether the decision applied the proper legal standards and made findings supported by substantial evidence. *Bray v. Comm'r*, 554 F.3d 1219, 1222 (9th Cir. 2009). Substantial evidence is more than a scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*. Where the record as a whole can support either a grant or denial, the Court may not substitute its judgment. *Id*.

## VI. Discussion

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). Absent affirmative evidence of malingering, and assuming impairments that could reasonably give rise to the reported symptoms, the ALJ must assess the credibility of the complaints. *See* 20 CFR 404.1529(c); *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006). These findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002). Factors to consider include the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; precipitating or aggravating factors; and palliative measures taken, including medication (type, dosage, effectiveness, and side effects), other medical treatment, and non-medical measures such as lying down or changing positions. *Id*. An

ALJ may also consider ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements, and other testimony that appears less than candid. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008).

The ALJ articulated several valid reasons for rejecting Plaintiff's claimed mental limitations. For one thing, the ALJ noted that there was "no indication" that Plaintiff had undergone significant therapy for her depression. Instead, her entire treatment history since the previous decision consisted of "check-ups and intermittent visits." Plaintiff objects to drawing inferences from this lack of treatment, arguing that she "never had the opportunity to confront the issue." In fact, the ALJ explicitly raised the issue at the hearing. AR 62-63 ("Has there been any mental health treatment at all by any mental health professional for your client which is not reflected in the record that you know about?" "[N]ot only are there no records but there's been no treatment, right?") More importantly, *Burch* makes clear that lack of treatment by itself implicates credibility.

This lack of treatment also belies Plaintiff's claim that the ALJ rejected Dr. Bansal's mental health assessment "solely" because he was not a mental health specialist. Rather, the ALJ considered Dr. Bansal's lack of expertise as an additional factor, giving greater weight to the expert opinions of Drs. Mohammed, Hirokawa, and the state agency consulting physicians. In her reply brief, Plaintiff makes much of the fact that Dr. Bansal observed Plaintiff's crying spells and Dr. Hirokawa did not. Dr. Bansal made these observations in March 2009, when Plaintiff was conclusively found to be not disabled. Although Dr. Hirokawa did not observe Plaintiff crying, he did observe her to have a "depressed" mood and "restricted" affect. Despite this, he concluded that her memory, intelligence, fund of knowledge, thought processes, and capacity to perform calculations were intact during the evaluation, and that she had a "friendly and cooperative" manner, unremarkable behavior, normal speech, normal interactions, and no evidence of psychosis or harmful ideation. In any event, it was Dr. Mohammed whose RFC the ALJ ultimately relied upon. Dr. Mohammed did consult the entire record, including Dr. Bansal's notes.

Because the ALJ relied on more than just the objective evidence to find Plaintiff's complaints less than credible, and because ALJ's findings are supported by substantial evidence, this Court must affirm.

**VII.     Conclusion**

The ALJ applied appropriate legal standards and substantial credible evidence supported the ALJ's determination that Plaintiff was not disabled. Accordingly, the Court hereby AFFIRMS the agency's denial of benefits. The Clerk of Court is directed to enter judgment for Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **August 14, 2013**                         **/s/ Sandra M. Snyder**
                                                                      UNITED STATES MAGISTRATE JUDGE